IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

\*\*\*\*\*\*\*

BANNER BANK, a Washington          CV 11-09-H-CCL
banking corporation,

       Plaintiff,

-v-                                    <u>OPINION & ORDER</u>

FIRST COMMUNITY BANK, a
Montana banking corporation,

       Defendant.

\*\*\*\*\*\*\*

Before the Court is a Motion for Summary Judgment (Doc. 22) filed by

Plaintiff Banner Bank ("Banner").  The Motion is opposed by Defendant First

Community Bank ("FCB").  Neither party has requested oral argument on the

motion.  The Court has reviewed the filings of both parties and finds that the

Motion should be and hereby is submitted on the briefs.  *See* Fed. R. Civ. P. 78;

*see also* D. Mont. L.R. 78.1 (Jan. 1, 2012).  Having reviewed the briefs and all the record, the Court is prepared to rule.

I.      Summary Judgment Standard.

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt").  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is

sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The Court must resolve factual controversies in favor of the nonmoving party when the facts specifically attested by that party contradict facts specifically attested by the moving party. Conclusory, nonspecific statements in affidavits are not sufficient, however, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

II.    Facts.

Banner Bank appears as Plaintiff in this case because Banner Bank merged with F&M Bank ("F&M") of Spokane, Washington, and succeeded to all of F&M Bank's rights and interests. In 2006, F&M Bank loaned $5,000,000 to Superior Propane, LLC ("Superior"), of Helena, Montana. Dean South and Gary Hebener[1]

---

[1]    Dean South, Gary Hebener, and Ernie Steiner were the principals of Superior Propane, LLC. (Doc. 27, Def's Brief in Opp. to Summ. Judg., at 2.) *See*

were guarantors on the Banner Bank loan.  (Doc. 26-5, Exh. E, Decl. Bruce W.

Nelson.)  Superior pledged all of its assets to secure the loan, and F&M perfected

a security interest in Superior's assets by filing a UCC financing statement with

the Montana Secretary of State in 2006 as to

> All Inventory, Chattel Paper, Accounts, Equipment and General
> Intangibles; whether any of the foregoing is owned now or acquired
> later; all accessions, additions, replacements, and substitutions
> relating to any of the foregoing; all records of any kind relating to any
> of the foregoing; all proceeds relating to any of the foregoing
> (including insurance, general intangibles and other accounts process).

(Doc. 26-4, Ex. D, Decl. Bruce W. Nelson.)

In April, 2009, two of three principals of Superior Propane, Mr. Dean South

and Mr. Gary Hebener, took out a $400,000 personal loan with First Community

Bank ("FCB") of Helena, Montana[2].  According to FCB's brief (citing the

_____

*also* Doc. 25-2, p. 3, Def's Answer to Interrog. No. 2.)

[2]   On April 20, 2009, South and Hebener took out a personal loan with
First Community Bank in the amount of $404,035.00.  South and Hebener gave
FCB a security interest in five propane tanks.  The loan was supported by a
Promissory Note and Extension, a Security Agreement, and a Financing Statement
and Commercial Guaranty.  Superior Propane, LLC, guarantied the loan.  (Doc.
29, Aff. Russ Noonan, ¶ 18.)  FCB filed a  UCC Financing Statement was filed

4

deposition of Dean South), the purpose of this loan was to assist Superior Propane in making payments on its loan with Banner Bank.  (Doc. 27, Def.'s Brief in Opposition, at 2.)  It was to be a six-month bridge loan that would also permit Superior Propane sufficient time to find additional financing.  Mr. South and Mr. Hebener pledged some of Superior's assets to secure the FCB loan, although neither South nor Hebener formally purchased any asset from Superior and did not present any title in the assets to FCB.  Nevertheless, FCB filed a U.C.C. financing statement with the Montana Secretary of State in April 2009 which asserted a security interest in five large propane tanks,[3] listing Mr. South and Mr. Hebener as debtors but not listing Superior as either a debtor or the owner of the assets being secured.

The $400,000 loan proceeds were initially deposited to the H&S (Hebener

_____

with the Montana Secretary of State on April 23, 2009, listing four 30,000 gallon propane tanks and one 60,000 gallon propane tank.  (Doc. 29-3.)

[3]     However, the FCB Security Agreement called for South and Hebener to pledge four 30,000 gallon propane tanks, one 60,000 gallon propane tank, and one trailer.  (Doc. 29-2, Exhibit B, Aff. Russ Noonan.)  The trailer is not listed on the UCC Financing Statement.

& South) account at FCB on April 21, 2009.  (Doc. 29-5, Ex. E, Aff. Russ Noonan.)  On April 22, 2009, Dean South wrote a check to Superior Propane in the amount of $200,000, and Superior signed that check over to Banner Bank for partial payment on its $5 million loan obligation.  (Doc. 29-6, Exhibit F.)  On April 28, 2009, Dean South wrote another check to Superior Propane in the amount of $172,000, and Superior signed that check over to Banner Bank for another payment on its $5 million loan obligation.  (Doc. 29-8, Exhibit H.)  On October 8, 2009, Dean South wrote a check on a "Harold's Meter Service"[4] account with Mountain West Bank, payable to the H&S account at FCB in the amount of $78,000.  (Doc. 29-9, Exhibit I.)  On December 4, 2009, a payment of $80,000 was made to the South/Hebener personal loan account at FCB from the H&S account.  (Doc. 29-5, Exhibit E, FCB Bank Statement for Note 8500314, Aff. Russ Noonan.)  Because it appears that the regular monthly payment on the personal loan was approximately $2,000, the $80,000 represents a $78,000

---

[4]   Harold's Meter Service is a dba of Superior Propane.

payment, presumably derived from the sale of the propane tanks, and the regular monthly payment of $2,000.

On October 15, 2009, Superior defaulted on its payment obligations to Banner, entitling Banner to immediate possession of Superior's assets pledged as collateral in 2006 to secure the $5,000,000 loan.  Currently, Superior owes more than $5 million to Banner Bank.

On a date unknown but thought to have occurred at some time in 2010, Superior sold two of the 30,000 gallon propane tanks to a Wyoming third party (whose name Mr. South could not remember at the time of his deposition) for approximately $80,000 ($40,000 each), according to the testimony of Mr. South. (Doc. 25-1, 1/21/11 Dep. of Dean A. South, 83:1-86:16.)  Dean South testified on January 21, 2011, as follows:

> Q.   Okay, all right. Who owned those tanks?
> A.   Well, they were Superior inventory.
> Q.   Okay. So they were owned by Superior?
> A.   Yes.
> Q.   Not you?
> A.   No.
> Q.   And not Mr. Hebener?

A.      No.

(Doc. 25-1, Ex. A, Decl. Anthony S. Wisen, p. 5, South TR 78:13-20.)

Q.      Okay.  But you didn't own the tanks?
A.      No.
Q.      Superior owned the tanks?
A.      Right.

(Doc. 25-1, Ex. A, Decl. Anthony S. Wisen, p. 5, South TR 79:10-13.)

Q.      Okay.   How about the other tanks?
A.      They've been sold.
Q.      Okay. When were the sold?
A.      Oh, a year or so ago.  And we reduced the loan by a hundred thousand
        to First Community.
...
Q.      For a total of how much?
A.      80-some-thousand.
Q.      And those dollars were paid to whom?
A.      First Community.
Q.      And I'm sorry, that happened roughly when?  I mean, as specifically
        as you can identify, when did that transaction occur?
A.      Probably a year ago.
Q.      Okay.  And these were tanks that belonged to Superior, right?
A.      Well, Superior was paid for them, Superior got their money out of
        them because they got the proceeds of the loan.
Q.      Let's simplify that a little bit.  The tanks you're talking about here
        were tanks that were titled in Superior's name, correct?
A.      They were inventory of Superior's.
Q.      So they belong to Superior?

8

A.    Yeah, but First Community paid Banner and Superior 3 or 4 hundred
      thousand for those tanks.

Q.    You're talking about the loan transaction?

A.    Yeah.

Q.    Okay.  So Superior owns these tanks and they were sold to somebody
      within the last year, who were they sold to?

A.    Oh, some propane company in Wyoming.

Q.    Okay.  Can you be any more specific?

A.    I don't recall their name.

...

Q.    ... You negotiated with this purchaser, some equipment company in
      Wyoming, the name of which you can't recall right now?

A.    I don't remember the name.

(Doc. 25-1, pp. 6-7, TR 83:6 - 86:11.)

According to South's testimony, Superior sold the tanks and used the

proceeds to make a payment to FCB on South/Hebener's personal loan.  Bank

records show that South transferred $80,000 from his account to the

South/Hebener loan account on December 4, 2009.  (Doc. 29-5, Exhibit E, FCB

Bank Statement for Note 8500314.)  Banner was not informed by anyone about the

sale of these tanks.  Prior to or contemporaneously with the making of the FCB

loan to South/Hebener, however, FCB was told by Mr. South and Mr. Hebener

that Mr. Hebener would obtain a waiver from Banner Bank of its rights to the two

propane tanks.  Despite this understanding, however, no party sought a waiver from Banner Bank, which did not discover the sale of the propane tanks until approximately one year after the fact.  Upon learning of the sale, Banner Bank promptly notified FCB that it (Banner Bank) had a security interest in the propane tanks that had been sold, and based on its security interest Banner Bank demanded payment of the proceeds of the sale of the propane tanks from FCB.

III.    Discussion.

This is a simple case of two competing security interests in two 30,000 gallon propane tanks, each tank worth approximately $40,000.  Banner Bank's security interest in Superior's assets was filed in 2006.  FCB's security interest in South/Hebener's assets was filed in 2009.  FCB was aware of Banner Bank's security interest in the assets of Superior.  Banner Bank was unaware of FCB's security interest in the assets of South/Hebener.  Banner Bank was unaware that Superior had sold the two tanks to a third party.  The $78,000 proceeds of the sale of the tanks was deposited by Superior on October 8, 2009, into Hebener and South's account at FCB.  From that account, South and Hebener paid $80,000 into

10

their FCB loan account on December 4, 2010.  FCB's security interest was

severely flawed in that FCB's debtors did not own the collateral being pledged as

security for the debtors' loan.

Now Banner Bank seeks a return of the $78,000 cash proceeds from the sale

of the two propane tanks from FCB.  FCB denies that Banner Bank is entitled to

these funds.  To defend against summary judgment, FCB relies primarily upon the

equitable argument of unjust enrichment and also upon its security interest in the

tanks and Montana's U.C.C. statutes.

A.  <u>Unjust Enrichment.</u>  FCB argues that it would be unjust enrichment for

Banner Bank to receive the cash proceeds for the sale of the tanks, because Banner

Bank had already been "paid" for the tanks by Superior's 2009 payments of

approximately $300,000.  By this argument, FCB refers to the fact that out of the

$400,000 loan, South/Hebener paid $300,000 to Superior, which turned the checks

over to Banner Bank.  (South and Hebener also paid $100,000 to Superior to cover

Superior's operating expenses.[5])  FCB now claims that when South/Hebener paid $300,000 to Banner Bank they were "paying" Banner Bank for the two propane tanks.  FCB also claims that when South/Hebener paid $100,000 to Superior, they were actually purchasing the propane tanks from Superior.

The problem with this argument is that when South/Hebener "paid" $300,000 to Banner Bank, they did not tell Banner Bank that the payment was for the two propane tanks upon which Banner Bank had attached a perfected security interest and that they were essentially buying back that security interest.  Banner Bank received the $300,000 simply as partial payment for the $5 million loan it had made to Superior.  Banner Bank never was asked to release its security interest

---

[5]   "It was paid on the line to Rob Dietz [of Banner Bank], 300,000 to reduce the line, . . . and the other hundred was put into Superior to operate."  (Doc. 25-1, Ex. A, Decl. Anthony S. Wisen, South TR 77:2-6.)  "Yes, it was all contributed to Superior to operate."  (Doc. 25-1, Ex. A, Decl. Anthony S. Wisen, South TR 77:13-14.)  "The other 100 was just put into Superior to try to keep operating."  (Doc. 25-1, Ex. A, Decl. Anthony S. Wisen, South TR 79:21-22.) "Q: Do you recall having adjusted your equity interest on account of that contribution? A. No. Q.  You just put the money in and didn't worry about the paperwork too much – A. Right."  (Doc. 25-1, Ex. A, Decl. Anthony S. Wisen, South TR 77:15-20.)

in the two propane tanks.  FCB has made no assertion that the $300,000 paid by Superior was above and beyond the payments then owed by Superior to Banner Bank, and this Court cannot assume that fact under these circumstances.  In fact, the evidence shows that Superior needed cash to make a loan payment to Banner Bank.  (Doc. 29, Aff. Russ Noonan, ¶ 6.)

Similarly, when South and Hebener purportedly paid $100,000 to Superior for the two propane tanks, they did not actually transfer title in the tanks to themselves or otherwise record the transaction in writing.  Apparently, these transactions existed in the minds of South and Hebener only, because they did not actually communicate the purpose of their payments to either Banner Bank or to Superior.  Moreover, South testified that he and Hebener gave $100,000 to Superior for operating expenses, not as payment for the tanks.  (Doc. 25-1, Ex. A, Decl. Anthony S. Wisen, South TR 77:2-6.)

In spite of the complete lack of documentation, FCB accepted this series of transactions as described to FCB  by South, and on this basis FCB argues today that Banner has been amply "paid" for the two propane tanks ($300,000 for an

13

$80,000 value), and FCB was therefore entitled to take the security interest on the tanks and then accept the proceeds of the two propane tanks from Superior.  In FCB's opinion, paying Banner Bank's demand of $78,000 would be "double counting" and an unjust enrichment to Banner Bank.

The Court cannot accept FCB's interpretation of the facts.  Banner Bank did not know it was being "paid" for a release of its security interest in the two propane tanks.  Banner Bank believed that it was being paid what it was owed on the $5 million note.  Banner Bank never granted a release of its security interest; nor did it know that a release was being sought.  Superior never actually sold the propane tanks to South and Hebener, as evidenced by any bill of sale or other document.  FCB also presents to the Court no evidence that South and Hebener had the power to transfer any rights to the propane tanks.  Thus, the evidence does not support FCB's assertion that Banner Bank was already paid once for the propane tanks, and it would be unjust enrichment for Banner to receive sale proceeds as a result of this litigation.

B.  <u>§ 30-9A-324(1) (Purchase-Money Security Interest).</u>  Under this statute,

FCB argues that its $400,000 loan to South and Hebener allowed it to perfect a purchase-money security interest in goods other than inventory[6] or livestock pursuant to § 30-9A-324(1), Mont. Code Ann., and such purchase-money security interest has priority over Banner Bank's conflicting security interest in the same goods.  Thus, FCB disputes that Banner Bank has the priority security interest. FCB maintains that South and Hebener did in fact purchase the tanks from Superior Propane in a transaction wherein South and Hebener gave Superior Propane the full value of the $400,000 FCB bridge loan and received in exchange five propane tanks and a trailer.  (Doc. 27, Def's Brief in Opp., p. 9.)  FCB argues that South produced for FCB some documents entitled "certificates of origin," for the propane tanks, which apparently indicated to FCB that South either owned the tanks or had some ownership rights by virtue of possession of these certificates. (However, FCB has not produced those certificates of origin as part of this record

_____

[6]   The Court notes that Dean South testified repeatedly that the two propane tanks were categorized as inventory of Superior Propane.  (Doc. 25-1, Ex. A, Decl. Anthony S. Wisen, South TR 77:24-25 - 78:13-14.)

and, moreover, FCB does not explain how the propane tanks' certificates of origin would verify ownership at the time FCB made the loan to South and Hebener.[7]) Continuing along with this argument, FCB concludes that Banner Bank should have released its security interest at that point and, if it didn't, this Court should deem the Banner Bank security interest to be lower in priority by operation of section 324 of Montana's U.C.C.

This argument is convoluted, to say the least. Normally, a purchase-money security interest has priority over a conflicting security interest because this is a

---

[7]   In fact, Russ Noonan testified at his deposition "I don't know if I can honestly tell you whether or not [South] owned [the tanks] at that point [when the FCB security agreement was signed] or not. He was pledging them as collateral. (Doc. 37, p. 8, TR 14:8-10.) Noonan also testified that "I don't believe [South] provided anything that showed an actual title or indication that these were personal assets that he owned at that time." (Doc. 37, p. 8, TR 14:20-23.) In fact, it appears that FCB relied upon the verbal assurance of South that he and Hebener could pledge these assets as collateral for their personal loan. FC B never followed up and demanded any documentation from South and Hebener regarding either their title, ownership, or rights in the tanks or Banner Bank's waiver of its perfected security interest in the tanks. FCB relied on South and Hebener's promises to give FCB a first lien position on the tanks and to work out the details for FCB. (Doc. 37, p.10, TR 63:4-10.) FCB never followed up on this, however, by demanding any documentation from South, Hebener, Superior, or Banner Bank.

new piece of equipment, for example, being purchased by a debtor.  Part of the definition of a purchase-money security interest requires "that the money lent was in fact used to acquire an interest in the collateral. . . ."  *United States v. Ballard*, 645 F.Supp. 788, 791 (D. Mont. 1986).  In the instant case, the Court is presented with this proposed set of "facts":  (1) South purchases an already-existing piece of equipment from the original debtor Superior (not a new piece of equipment from a manufacturer or some other third party), (2) South gives the equipment back to Superior, allowing (3) Superior to sell the item of equipment free of Banner's prior perfected security interest, and then (4) South receives the sale proceeds from Superior, to enable (5) South to pay down his "purchase-money loan" from FCB. There is no new item of equipment being purchased by the original debtor, and the purpose of the transaction appears to be (1) to allow the debtor Superior to evade Banner's perfected security interest so that the previously-encumbered equipment could be sold to a third-party; (2) to obtain a temporary infusion of cash into Superior via the FCB loan; or (3) both to convert existing equipment into cash and to obtain the temporary infusion of cash from another bank.  As was the case in

17

*Ballard*, no bill of sale exists to document South's purchase of the tanks, and only his cancelled checks to Superior are presented to evidence the purported purchase. Moreover, it was Superior (through its d/b/a Harold's Meter Service) that transmitted the proceeds from the sale of the tanks to South.  Finally, South testified that Superior owned the tanks and Superior sold the tanks.  FCB's argument that it has a purchase-money security interest is without merit, first because the propane tanks are inventory and second because there is no record of any purchase of the tanks from Superior by South and/or Hebener.

Banner Bank disagrees that FCB has a perfected security interest in the propane tanks at all, on the ground that neither South nor Hebener ever owned the tanks.  Indeed, in order to maintain a perfected security interest, a security agreement must be made in writing, the debtor must give value, and the debtor must have rights in the collateral.  § 30-9A-203(2)(a)-(c), Mont. Code Ann.  The Court finds itself in agreement with Banner Bank that FCB did not have a valid perfected security interest in the propane tanks because South and Hebener did not possess the requisite rights in the collateral.  Even though given ample

18

opportunity, FCB has failed to provide any documentation purporting to give either South or Hebener rights in the propane tanks. There is simply no evidence that supports their pledge of that collateral to FCB on their personal loan. The Court understands that in South and Hebener's minds, it was *as if* they were buying the tanks from Superior by giving cash to Superior and then directing Superior to give cash to Banner Bank. There are several problems with this viewpoint, however. One is that Superior owed the money to Banner Bank anyway. Another problem is that when Superior made payments to Banner Bank in 2009, Superior never notified Banner Bank that these particular payments were made in order to obtain a release of Banner's security interest on the propane tanks. Then, too, no actual release was ever sought or obtained, so that the series of transactions that South claims to have envisioned was never communicated with Banner Bank. The idea that South and Hebener somehow bought the tanks (without any paperwork and without any discussion or documentation with the relevant parties, such as Superior and Banner Bank), is simply fiction. The fact that FCB bought into that fiction will not cure the flaw in FCB's security interest,

19

which is not valid because it lacks the requisite set forth in Mont. Code Ann. § 30-9A-203(2)(b): "the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party...."  FCB never demanded documentation of ownership in the collateral from the debtors or any other proof that they had the power to transfer rights in the collateral.  South admitted numerous times during his deposition that the tanks were owned by Superior.  South's cancelled checks to Superior could represent anything.

Now that this summary judgment procedure has provided FCB with an opportunity to produce its evidence of its perfected security interest, FCB has failed to produce any evidence that South and Hebener ever possessed "rights in the collateral or the power to transfer rights in the collateral to a secured party...." § 30-9A-203(b), Mont. Code Ann.  Lacking this proof, FCB's claim to have a perfected security interest fails because FCB's security interest is not enforceable under Montana law.

C.  <u>§ 30-9A-332(1)</u>.  FCB alternatively argues that it took the $80,000 transfer of money from a deposit account on December 4, 2009, free of Banner

Bank's security interest, citing § 30-9A-332(1), Mont. Code Ann.  That statute

provides:

> 30-9A-332.  Transfer of money – transfer of funds from deposit
> account.  (1) A transferee of money takes the money free of a security
> interest unless the transferee acts in collusion with the debtor in
> violating the rights of the secured party.

Thus, FCB claims to be a transferee of the funds free and clear of Banner Bank's

security interest, pursuant to Montana statute.  FCB argues that *In re Cumberland*

*Molded Products, LLC*, 2009 WL 2208582 (Bkrtcy. M.D. Tenn 2009), stands for

the proposition that under Tennessee's version of Montana's money transfer

statute, a transferee of funds takes free and clear of the claimed security interest in

the bank account.

   In *Cumberland* the secured interest was held by the bank wherein the

deposit account was located; the deposit account held funds lent by the bank to the

debtor.  After the bank's debtor defaulted on the loan and declared bankruptcy, the

bank simply failed to utilize its right of setoff by freezing the loan funds remaining

in the bank account and instead allowed the debtor to transfer funds to a

bankruptcy trustee by check, not once but twice.  In each instance, the secured party bank honored the check written by the debtor to the bankruptcy trustee, when in fact the bank could have frozen the account.  The court found no collusion between the transferee (the bankruptcy trustee) and the debtor, and therefore granted summary judgment in favor of the trustee and the debtor and against the secured party, the bank.

Obviously, the facts in the instant case are not similar to *Cumberland* because Banner Bank had no knowledge of, much less direct control over, the funds transferred out of Hebener and South's FCB bank account to pay off their FCB loan.  Moreover, *Cumberland Molded Products, LLC* was reversed on appeal to the U.S. Bankruptcy Appellate Panel of the Sixth Circuit, which held that the bankruptcy trustee could not avoid the bank's security interest which was properly perfected prior to the date of the bankruptcy petition and the bankruptcy trustee was not a transferee within the meaning of the Uniform Commercial Code.  *In re Cumberland Molded Products, LLC. v. First National Bank of Woodbury*, 431 B.R. 718 (2010).

Next, FCB cites *Orfix Financial Services, Inc. v. Mike Kovacs*, 167 Cal.App.4th 242, 83 Cal.Rptr.3d 900 (Cal. 2008), for the proposition that, under California's version of the Montana statute, an unsecured judgment creditor who has garnished funds in a deposit account has a superior interest over a secured creditor by virtue of the judgment creditor's actual execution on the account. Here, FCB is not a judgment creditor who has executed on the funds in South and Hebener's account. Also, the policy underlying this statute, which is in part to provide finality for further transactions by innocent transferees, *see* Mont. Code Ann. § 30-9A-332, Official Comment No. 3 to Uniform Commercial Code § 9-332 (policy underlying -332 is to "minimize[] the likelihood that a secured party will enjoy a claim to whatever the transferee purchases with the funds."), is not at issue here. FCB is not a transferee who has received funds from South and Hebener and then used those funds to purchase some goods or services in another, further transaction that is entitled to finality. Indeed, the Court is uncertain whether FCB can be a transferee for purposes of this statute for the reason that South and Hebener's transfer into their FCB loan account is a credit to their account, and a

23

transfer to themselves, and not an outright transfer to FCB.

Even if FCB were considered to be a transferee for purposes of the money transfer statute, there is still the issue of collusion.  FCB asserts--and this Court agrees--that FCB's mere awareness of Superior's sale of Banner Bank's collateral does not support a finding of collusion.  Therefore, FCB argues, the collusion exception contained in § 30-9A-332(1), M.C.A., does not apply on these facts, and it is a transferee of money that can take the money free of Banner Bank's security interest.

Banner bank counter-argues that Mr. Noonan's deposition shows that FCB did collude in the sale of the propane tanks.  Banner asserts that, in consequence of this, FCB is not entitled to the protection it would otherwise have under section 30-9A-332, Mont. Code Ann.

The Court does not find that FCB intended at the outset of its loan transaction to collude with Superior Propane to the detriment of Banner Bank, but little by little FCB's conduct during the South/Hebener loan transaction edged toward and eventually transformed into a *de facto* collusion with Superior against

Banner.  FCB's complete failure to ascertain the ownership or power to transfer

rights in the collateral as pledged by South and Hebener certainly permitted

Superior Propane to defraud its primary secured creditor.  Essentially FCB's

inattention to the most important details of the loan transaction allowed South and

Hebener to pledge assets they did not own for their $400,000 personal loan.

Further, FCB's failure to require South and Hebener to provide documentation of

Banner Bank's waiver of its security interest effectively kept Banner Bank

completely in the dark about a potential bank conflict over Superior's assets or

about a possibility that Superior might want to sell these encumbered assets.

 The Court can accept Russ Noonan's claim that he simply misspoke when

he testified as Vice President of FCB that "as to the tanks, I'm not sure where they

are at this point.  I know that *we've* sold a couple."  (Doc. 37, p. 11, TR 6-8.)  But

Noonan also testified that both he and his superior, Mr. Rick Wiedeman, FCB

Branch Manager, knew about the sales of the propane tanks.  Noonan testified that

"Dean [South] asked the question whether or not if he sold assets what would

happen, and Mr. Wiedeman's response to him was that they would be applied to

the [FCB South/Hebener] loan."  (Doc. 37, p. 11, TR 22-25.)  In fact, South

testified that this advice had indeed been given to him by FCB.[8]  This goes well

beyond "mere awareness" of the sale.  This is evidence that FCB knew that the

sale was in the offing and directed South to apply the proceeds of Superior's

propane tank sales to the FCB loan account, knowing that Banner Bank held a

perfected security interest on all of Superior's assets as collateral for its $5 million

loan.  Also, the evidence shows that the December 4, 2009 payment of $78,000 on

the FCB loan was not in the ordinary course of business in that it was a one-time

payment and not a regularly-scheduled payment or a regularly-scheduled sweep of

the deposit account.  All other monthly payments made by South and Hebener to

FCB on their loan account were made in varying amounts, all less than $2,500.

(Doc. 29-5, Ex. E, Aff. Russ Noonan.)  FCB either was aware of the wrongfulness

_____

[8]   "Q. . . . Did you consult with First Community Bank in connection with that sale [of the propane tanks]? A.  Yes.  Q. Did you tell them, I've been approached, I'm gonna sell it, here's the price? A. Yes. Q. Did they say – did they tell you that they believed that they were entitled to the proceeds of that sale?  A. Oh, yes."  (Doc. 25-1, Ex. A, Decl. Anthony S. Wisen, South TR 95:15-24.)

of this transaction or chose to remain willfully ignorant.  Such willful ignorance

satisfies the collusion exception of § 30-9A-332(1), Mont. Code Ann.

The Court having found *de facto* collusion between FCB and Superior, FCB

cannot take the $78,000 deposited on December 4, 2009, free of Banner Bank's

security interest.  In other words, FCB knew or should have known that Superior

Propane was evading Banner Bank's perfected security interest in its sale of the

propane tanks and transfer of the proceeds into South and Hebener's FCB loan

account.

D.  §§ 30-9A-314, 30-9A-104, 30-9A-315.  FCB argues that Mont. Code

Ann. § 30-9A-314 ("Perfection by control") gives FCB a security interest in the

H&S deposit account.  That statutes provides as follows:

> 30-9A-314.  Perfection by control.  (1) A security interest in
> investment property, a deposit account, a letter-of-credit right, or
> electronic chattel paper may be perfected by control of the collateral
> under 30-7-107, 30-9A-104, 30-9A-105, 30-9A-106, or 30-9A-107.
> (2) A security interest in a deposit account, electronic chattel paper, a
> letter-of-credit right, or electronic document is perfected by control
> under 30-7-107, 30-9A-104, 30-9A-105, or 30-9A-107 when the
> secured party obtains control and remains perfected by control only
> while the secured party retains control. . . .

27

FCB asserts that it had control of the H&S deposit account within the meaning of that Montana statute.  In addition, FCB cites Mont. Code Ann. § 30-9A-315 ("Control of deposit account"), which provides that

> 30-9A-104.  Control of deposit account.  (1) A secured party has control of a deposit account if: (a) the secured party is the bank with which the deposit account is maintained; . . .

FCB thus claims that it is a secured party that has a perfected security interest in the tanks that were sold and, further, that it had control over the deposit account into which the proceeds were placed (the H&S account).

FCB points out further that under Montana law, § 30-9A-315 ("Secured party's rights on disposition of collateral and in proceeds"), a security interest in proceeds of the sale of collateral, such as security interest of Banner Bank in the proceeds of the propane tank sales, is only perfected for 21 days, unless the secured party takes control of the proceeds.  Here, Banner Bank did nothing for "more than one year after the money was deposited in First Community Bank and transferred to the loan."  (Doc. 27, Def's Brief in Opp., p. 7.)

Banner Bank counter-argues that Montana statute does not require it to take

28

possession of the proceeds within 21 days under the circumstances here.  Banner

Bank asserts that the $78,000 that FCB applied to South and Hebener's personal

loan was directly traceable to the sale of Banner's propane tank collateral and all

statutory requisites are met to justify maintaining the perfected security interest

beyond the 21st day, under the exception provided by § 30-9A-315(4)(I)-(iii).

Therefore, according to this argument Banner's security interest in the proceeds

continues to this day in proceeds of the collateral pursuant to § 30-9A-315, Mont.

Code Ann.

In the Court's view, FCB's statutory arguments in favor of perfection by

control, control over a deposit account, and rights to proceeds of the sale of

collateral are all made irrelevant by the fact that the Court finds that FCB does not

have a valid perfected security interest.  Each of these statutes requires in the first

instance a perfected security interest, which FCB did not and does not have.

These miscellaneous statutory arguments are therefore without merit.

FCB has two other miscellaneous arguments connected to Montana's

U.C.C. laws.

E.   <u>Banner Bank's Failure to Perfect Security Interest in Wyoming.</u>  FCB points out that "the tanks were sold to an outfit in Wyoming."  (Doc. 27, Def's Brief in Opp., p. 10.)  FCB notes that Banner Bank did not file UCC financing statements in Wyoming, and thus has no perfected security interest in Wyoming. FCB suggests that the tanks might have been located in Wyoming when they were sold.  However, the Court finds nothing in the record to support such a bald assertion as that the tanks perhaps were located in Wyoming before being sold, nor can the Court think of any reason Banner Bank could be expected to have perfected its security interest by filing it in Wyoming.  This argument is without merit.

F.   <u>Identifiability/Commingling of Funds.</u>  FCB asserts that even if the $78,000 deposit to the H&S account was made with funds from the sale of Banner Bank's collateral, those funds were commingled with other funds for two months before they were transferred to the loan account and were therefore not identifiable.

Banner Bank counter-argues that FCB does not quarrel with the fact that the

proceeds of the sale of the propane tanks were $78,000, that the proceeds were deposited into the H&S deposit account (as a deposit from Mountain West Bank) and that the proceeds were then transferred to the FCB loan account.  In his deposition, FCB Vice President Noonan testified on September 27, 2011 that Mr. South had informed FCB that $78,000 was the proceeds of the sale of the propane tanks and that these funds were deposited in the H&S account and then used to pay down South/Hebener's loan account in the amount of $80,000 on December 4, 2009:

> Q.    Do you know the amount of proceeds that were received?
> A.    78,000.
> Q.    And that was applied to the FCB loan balance; is that right?
> A.    It is my understanding that they applied loan proceeds to the loan from the sale of assets, yes, per Mr. South.

(Doc. 37, p. 11, 74:4-11.)

> Q.    Okay. I'd like to refer you to an entry dated December 4, 2009, in the amount of $80,000.  Do you see that?
> A.    Yes.
> Q.    What was the nature of that, what appears to be a paydown?
> A.    It is my understanding today that those proceeds are what we're arguing over, the sale of a couple of tanks.

(Doc. 37 p. 11, 75:15-23.)

> Q.    Okay.  So the $78,000 that was applied toMr. South and Mr.
>       Hebener's loan, those funds originated from the Superior Propane
>       account, is that right?
> A:    Yes.

(Doc. 37, p. 12, 78:25-79:4.)

However, following the deposition, Russ Noonan subsequently submitted

an Affidavit dated six days later in which he asserted that "Neither Mr. South, Mr.

Hebener, nor anyone else from Superior Propane discussed the deposit with

anyone at First Community Bank."  (Doc. 29, p. 5-6, ¶ 26.)  This is parsing rather

finely.  Although neither South nor Hebener discussed the specific *deposit* with

FCB officers, South did discuss what to do with the proceeds of the propane tank

sales and was told by FCB's bank manager to use the proceeds to pay down

South's FCB loan account, which is exactly what South did.  Noonan's Affidavit

therefore does not raise a genuine issue as to (1) whether identifiable proceeds

were deposited into the FCB loan account, or (2) whether FCB representatives

knew that identifiable proceeds of tank sales were going to be deposited into the

FCB loan account.  The evidence is clear that identifiable proceeds were deposited

and that FCB knew that proceeds from the sale of collateral were going to be

deposited because FCB told South to give the proceeds to FCB.  FCB's attempt to

raise a genuine issue is ineffective.


IV.    CONCLUSION:

FCB takes the position that the two propane tanks sold in 2010 did not

belong to Superior but to Mr. South and Mr. Hebener.  That position is not

supported by this record, and FCB makes no attempt to prove ownership or rights

of transfer in South and Hebener.  All of the evidence points the other way, to

ownership in Superior Propane.  Mr. South testified in his deposition that the tanks

belonged to Superior and were never purchased by him or Mr. Hebener from

Superior.  (Doc. 25-1, p. 5, South TR 78:13-20, and TR 77:2-6 (explaining that

South gave $100,000 to Superior "to operate").)  South did not purchase tanks

from Superior with the FCB loan.

In 2006, Banner Bank obtained a perfected security interest on all of

Superior Propane's assets in connection with Banner Bank's $5 million loan to

Superior.  In 2009, South and Hebener pledged some of those assets to First

Community Bank in order to obtain sufficient cash to avoid defaulting on the

Banner Bank loan and to keep Superior Propane operating.  In 2010, Superior

Propane sold some of the assets encumbered by Banner Bank and transferred the

proceeds to South and Hebener, who used the proceeds to pay down their personal

loan with First Community Bank.  All the while, First Community Bank knew that

Banner Bank had perfected a security interest on Superior Propane's assets, yet

FCB accepted a pledge of some of those assets as collateral for a personal loan of

$400,000 to South and Hebener, and FCB directed South to deposit sale proceeds

from the assets into the FCB loan account.  The Court finds no genuine issue of

material fact as to Banner Bank's perfected security interest on the two propane

tanks, and the proceeds of the sale of the two propane tanks are identifiable and

traceable to the FCB loan account.  Pursuant to § 30-9A-315(1), "a security

interest . . . continues in collateral notwithstanding sale . . . therefor unless the

secured party authorized the disposition free of the security interest; and . . . a

security interest attaches to any identifiable proceeds of collateral."  The statutory

exception applies so that Banner Bank's perfected security interest in proceeds

34

continues to this day.  Mont. Code Ann. § 30-9A-315(4).  Therefore, FCB must comply with Banner Bank's demand for payment of the $78,000 proceeds from the sale of the two tanks.

Accordingly, finding that there is no genuine issue as to any material fact and Banner Bank is entitled to judgment as a matter of law,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 22) is GRANTED.  Let Judgment enter in favor of Plaintiff Banner Bank against Defendant First Community Bank in the amount of $78,000, along with reasonable attorneys' fees and costs to be paid by Defendant upon the filing of an appropriate motion.

IT IS FURTHER ORDERED that Defendant's Motion to Compel Mediation, filed on February 23, 2012, is DENIED.

Done and Dated this 28th day of February, 2012.

CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE